Filed 11/30/17

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, LOCAL 1998 et al., | D070620 |
| Plaintiffs and Respondents, | (Super. Ct. No. 37-2014-00041656-CU-OE-CTL) |
| v. | |
| NASSCO HOLDINGS INC. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Meyer, Judge. Affirmed.

Morrison & Foerster, James R. Sigel, Miriam A. Vogel; Morgan Lewis & Bockius and Jason Scott Mills for Defendants and Appellants.

U.S. Chamber Litigation Center, Janet Galeria; California Manufacturers & Technology Association, Dorothy E. Rothrock; Munger, Tolles & Olson, Fred A. Rowley, Jr., and Aaron D. Pennekamp for Chamber of Commerce of the United States of America, National Association of Manufacturers, California Manufacturers &

Technology Association, and Shipbuilders Council of America as Amici Curiae on behalf of Defendants and Appellants.

Klapach & Klapach, Joseph S. Klapach; Kelley Semmel and Amy Semmel for Plaintiffs and Respondents.

Under a California law known as the California WARN Act, employers must provide 60 days' notice to affected employees before ordering a "mass layoff." (Lab. Code, § 1400 et seq.)[1] A labor union and several employees sued an employer, alleging the employer violated this law by failing to provide notice before ordering about 90 employees not to return to work for four to five weeks. The employer countered that the California WARN Act was inapplicable because its action was a temporary furlough and not a "mass layoff." All parties recognized there was no liability under the parallel federal WARN Act because the federal law applies to a temporary layoff only if the layoff "exceed[s] 6 months." (29 U.S.C. § 2101(a)(6)(B).)

The parties filed cross summary judgment/adjudication motions raising primarily the duty issue: did the employer have a statutory duty to notify the affected employees even though the layoff was temporary, rather than permanent? The superior court concluded the California WARN Act did apply to the employer's temporary layoff, and therefore the employer owed a statutory notification duty to the affected workers. The court thus granted summary adjudication in plaintiffs' favor on this issue. The court then

_____

[1]    All unspecified statutory references are to the Labor Code. WARN stands for Worker Adjustment and Retraining Notification Act. (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1078 (*MacIsaac*).)

2

held a one-day bench trial on damages issues. After trial, the court entered judgment in plaintiffs' favor, awarding the workers $211,405 in backpay and lost pension benefits. The court denied plaintiffs' request for statutory penalties, finding the employer acted in good faith because the legal issues were "unsettled."

On appeal, the employer contends the court erred in interpreting the California WARN Act as applying to temporary layoffs. We affirm. Based on our analysis of the statutory language, statutory scheme, legislative history, federal WARN law, and policies underlying the California WARN Act, we determine the employer had a duty to provide statutory notice under the particular circumstances of this case, even if the layoffs were not permanent and were for less than six months.

FACTUAL AND PROCEDURAL BACKGROUND[2]

NASSCO Holdings Incorporated and National Steel and Shipbuilding Company (collectively NASSCO) employs thousands of workers in its ship building and repairing business. NASSCO employees are represented by The International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers, Local 1998 (the Union). NASSCO's staffing requirements change frequently, and its collective bargaining agreement contains rules applicable to terminations and short-term unpaid work stoppages. The agreement refers to a short-term work stoppage as a "layoff."

---

[2]     Because the appeal concerns solely the court's summary adjudication and summary judgment rulings, we consider only the evidence before the court when it made these rulings. To the extent the parties discuss evidence presented at the later trial, this evidence is not properly before us.

By early 2014, NASSCO determined it would need to temporarily reduce its labor force because there would be a lull in its shipyard production work. On March 3, 2014, NASSCO notified about 14 employees on the day they reported to work that they were not to return to work for at least three weeks. The written notice characterized the reduction as a layoff. NASSCO later notified these employees the layoff would be extended by several weeks. On March 17, 2014, NASSCO notified about 76 additional employees they were laid off for at least three weeks. They were not given prior notice of the layoff.

Between March 3, 2014 and March 17, 2014, a total of about 90 NASSCO employees were laid off, without work or pay (except for the reporting time pay on the day they were told not to return to work) for three to five weeks. Some of the laid-off employees returned to work on April 7, 2014, with the remainder returning on April 14, 2014. When the workers returned to work, they returned to their same job classifications.

On March 17, 2014, the Union president wrote to NASSCO, claiming NASSCO's action in laying off more than 50 workers within a 30-day period triggered statutory notice protections. Later that day, NASSCO responded that it had not implemented a "layoff," and instead it was a "furlough[]" or a "manpower reduction," and that *under the federal WARN Act*, notice is not required "when the layoffs are for less than a 6 month period." NASSCO said it was aware of the impact the "furloughs may have on its employees. Therefore, . . . NASSCO has continued to extend certain benefits to these furloughed employees," including that it has "1) continued to pay BOTH the employer

4

contribution **AND** the employee portion of the health care premiums; and 2) allowed employees to continue to accrue seniority."

Despite the representation regarding the health care premiums, the workers were initially charged for and paid their own health care obligations. However, they were later reimbursed for these payments. During their time off, the employees were not paid any wages (except for a few workers who elected to use their accrued vacation wages), nor did they earn vacation pay or accrue service credit for purposes of pension benefits.

In December 2014, the Union and three individual employees (Alberto Florian, Gustavo Perez, and Jose Rodarte) sued NASSCO alleging it violated the California WARN Act and seeking back pay and millions of dollars in statutory penalties.

Plaintiffs moved for summary judgment/adjudication claiming the undisputed facts showed NASSCO (1) had a statutory duty under the California WARN Act to give 60 days' notice before the March 2014 layoffs; (2) breached that duty; and (3) failed to conduct a reasonable investigation into whether its actions would violate the California WARN Act. In its cross-motion, NASSCO argued the undisputed facts showed (1) it had no statutory duty to provide notice of the layoffs and thus did not breach any duty; and (2) it was not subject to statutory penalties because it conducted a reasonable investigation in good faith as to whether it was required to give 60 days' notice under the California WARN Act.

In their moving and opposing papers, the parties agreed NASSCO is a "covered establishment" under the California WARN Act; the short term labor force reduction was the result of a lack of work; and the reduction was not necessitated by a physical calamity

5

or an act of war. They also agreed that NASSCO did not provide 60 days' notice of the layoff to the employees. Both sets of parties also recognized the duty issue was dependent on the court's interpretation of the California WARN Act provisions, and each submitted numerous documents reflecting the Act's legislative history, of which the court took judicial notice.

After considering the arguments and written submissions, the court denied NASSCO's summary judgment motion, and granted plaintiffs' summary adjudication motion, finding the undisputed facts showed NASSCO violated its statutory obligation to provide advance notice of the layoffs under the California WARN Act. The court then conducted a trial on the damages issues. At the close of evidence, the court ruled that the laid-off employees were entitled to backpay and lost pension benefits, but declined to award civil penalties. The court then entered final judgment in plaintiffs' favor for $211,405 plus interest, costs, and attorney fees. NASSCO appeals, challenging the court's denial of its summary judgment motion and the court's grant of plaintiffs' summary adjudication motion. Several business organizations filed a joint amicus curiae brief supporting NASSCO's position.[3]

---

3    These organizations are: the United States Chamber of Commerce, the National Association of Manufacturers, the California Manufacturers & Technology Association, and the Shipbuilders Council of America.

## DISCUSSION

### I. *Review Standard*

Summary judgment is proper if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A court shall grant a summary adjudication motion on a duty issue if the undisputed facts show the "defendants either owed or did not owe a duty to the . . . plaintiffs." (Code Civ. Proc, § 437c, subd. (f).) We review summary judgment and summary adjudication rulings de novo. (*State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1031.)

### II. *Statutory Interpretation Rules*

This appeals turns on the proper interpretation of the California WARN Act. In considering the parties' competing statutory interpretations, " ' "[o]ur fundamental task . . . " ' . . . ' "is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." ' " (*People v. Pennington* (2017) 3 Cal.5th 786, 795 (*Pennington*).) We focus on " 'the statute's actual words, the "most reliable indicator" of legislative intent, "assigning them their usual and ordinary meanings . . . ." ' " (*Ibid.*) We view the statutory language in context, and do not determine its meaning " 'from a single word or sentence.' " (*Ibid.*) "[A]pparent 'ambiguities often may be resolved by examining the context in which the language appears and adopting the construction which best serves to harmonize the statute internally and with related statutes . . . .' " (*Ibid.*)

If the statutory text "is unambiguous and provides a clear answer, we need go no further." (*Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758.) However,

7

if the statutory language is not clear, a court may resort to other interpretive aids, including the statute's legislative history and " ' "the wider historical circumstances of its enactment." ' " (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 850; accord *926 North Ardmore Ave., LLC v. County of Los Angeles* (2017) 3 Cal.5th 319, 328.) Courts may also consider the purpose of the statute, the evils to be remedied, and the public policy sought to be achieved. (*Fluor Corp. v. Superior Court* (2015) 61 Cal.4th 1175, 1198; see *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616-617.) " ' "Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." ' " (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1233.)

We review de novo a trial court's statutory interpretation. (*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.)

### III. *California WARN Act*

We begin by summarizing the California WARN Act. The California WARN Act consists of four main parts: (1) the notice duty; (2) the statutory definitions; (3) the exceptions to the notice duty; and (4) the rules governing civil damages, penalties, and attorney fees.

*The Notice Duty*

Section 1401 imposes the statutory notice duty. Section 1401, subdivision (a) states: "An employer may not order a mass layoff, relocation or termination at a covered establishment unless, 60 days before the order takes effect, the employer gives written notice of the order to the following: [¶] (1) the employees of the covered establishment

8

affected by the order; [and] [¶] (2) [specified public officials and agencies]." Section 1401, subdivision (b) provides: "An employer required to give notice of any mass layoff . . . under this chapter shall include in its notice the elements required by the federal [WARN] Act. (29 U.S.C. Sec. 2101 et seq.)."

*Defined Terms*

Section 1400 defines the terms used to impose the notice duty. Of relevance here, " 'Covered establishment' means any industrial or commercial facility . . . that employs, or has employed within the preceding 12 months, 75 or more persons." (§ 1400, subd. (a).) " 'Employer' means any person . . . who directly or indirectly owns and operates a covered establishment." (§ 1400, subd. (b).) " '*Mass layoff' means a layoff during any 30-day period of 50 or more employees at a covered establishment*." (§ 1400, subd. (d), italics added.) " '*Layoff' means a separation from a position for lack of funds or lack of work*." (§ 1400, subd. (c), italics added.) " 'Termination' means the cessation or substantial cessation of industrial or commercial operations in a covered establishment." (§ 1400, subd. (f).)

*Statutory Exceptions*

The code section imposing the notice duty contains an exception to this obligation: "[A]n employer is not required to provide notice if a mass layoff, relocation, or termination is necessitated by a physical calamity or act of war." (§ 1401, subd. (c).) Other statutes identify additional exceptions, including for certain industries (e.g., the motion picture industry) (§ 1400, subd. (g)(1)); for certain employees (e.g., seasonal employees or employees hired for a limited project) (§ 1400, subd. (g)(1), (2)); and for

9

certain circumstances when the employer is "actively seeking capital or business" (this latter exception is applicable only to a "relocation" or "termination," and not a mass layoff) (§ 1402.5).

*Remedies:  Civil Damages, Penalties, and Attorney Fees*

Section 1402 governs the effect of a failure to provide the required notice.  Section 1402, subdivision (a) states that an employer who violates the notice requirement "is liable to each employee entitled to notice who lost his or her employment," and the damages consist of "back pay" and the value of any lost benefits to which the employee would be entitled to "if his or her employment had not been lost."  Section 1402, subdivision (c) provides that the amount of the employer's liability is reduced by "[a]ny wages . . . paid by the employer to the employee during the period of the employer's violation," and any other voluntary, unconditional, or specified third-party payments.

Sections 1403 and 1405 concern civil penalties.  A failure to provide notice to the specified public officials and agencies may subject the employer to a penalty of no more than $500 "for each day of the employer's violation," unless the employer pays the employees within three weeks from the date of the layoff/relocation/termination order. (§§ 1403, 1401, subd. (c).)  Additionally, the penalties may be reduced if the "employer conduct[s] a reasonable investigation in good faith, and had reasonable grounds to believe that its conduct was not a violation of [the California WARN Act]."  (§ 1405.)  A prevailing employee is entitled to recover reasonable attorney fees, but a prevailing employer is not.  (§ 1404.)

10

IV. *Analysis*

A. *Plain Language Analysis*

NASSCO agrees it was required to provide 60 days' notice before imposing a "mass layoff"; it temporarily placed at least 90 workers on unpaid work status during a 30-day period in March and April 2014; and it took this action because of a "lack of work." But NASSCO contends no notice was required because its work stoppage was only for a brief period and therefore its action was not a " 'layoff' " or " 'mass layoff.' " Plaintiffs respond that notice was required because the statutory phrase "mass layoff" includes the type of temporary layoffs that occurred here.

Both parties center their appellate arguments on the meaning of a "layoff" in contexts other than the California WARN Act. But this is not where we begin because the statute specifically defines the term. (See *Duty v. Abex Corp.* (1989) 214 Cal.App.3d 742, 750 [" ' "When a statute prescribes the meaning to be given to particular terms used by it, that meaning is generally binding on the courts." ' "].) The California WARN Act defines a "layoff" to mean "a *separation* from a position for lack of funds or lack of work." (§ 1400, subd. (c), italics added.) Under its plain meaning, "separation" means an action of moving apart, and does not contain a temporal component. Under a commonsense understanding, a separation can be permanent or it can be temporary. Thus, the fact that the work stoppage was temporary does not logically take the action outside the scope of the statutory duty.

This conclusion is bolstered by the statutory context in which the word "separation" appears. The Legislature used the phrase "from a position" immediately

11

after the word "separation."  (§ 1400, subd. (c).)  The concept of being separated *from a position* does not suggest a requirement that the employment *relationship* be severed.  The Legislature could have defined a layoff to mean an "employment termination" or even "separation from employment."  But the Legislature did not use these words.

In one of the leading cases interpreting the California WARN Act, the court found the "from a position" definitional phrase to be critical.  (*MacIsaac*, *supra*, 134 Cal.App.4th at pp. 1084-1087.)  In *MacIsaac*, the court addressed the issue whether there had been a " 'mass layoff' " under the California WARN Act if employees were transferred from one employer to another under circumstances in which they performed the same work at the same rates of pay and retained the same benefits.  (*MacIsaac*, at pp. 1079-1081.)  The plaintiff argued this action was a " 'layoff' " because the employees were separated from the existing employer.  (*Id.* at pp. 1085-1086.)  Finding the statutory definition of the term " 'layoff' " to be "unambiguous," the court rejected this argument, explaining:  "The statute defines 'layoff' as 'a separation *from a position* for lack of funds or lack of work.' [Citation.]  In contrast to [this] plain language . . . , [the plaintiff] focuses on whether the employee was separated from a particular *employer*.  But under the Legislature's express definition, that is clearly the wrong question.  Under the Legislature's chosen definition of 'layoff,' the determining factor is whether the employee has been separated from 'a position,' not whether the employee is separated from an 'employer.'  [Citation.] [¶] The Legislature might easily have chosen to define 'layoff' in language that would yield [the plaintiff's] desired interpretation.  For example, the Legislature might have defined 'layoff' by reference to severance of the relationship

12

between an employee and an 'employer' rather than by reference to severance of the relationship between an employee and 'a position.' Or, the Legislature could have defined 'layoff' by tying the term to the cessation of an employee's work at a particular 'covered establishment.' (Cf. § 1400, subd. (f) ['termination' defined as 'the cessation or substantial cessation of industrial or commercial operations in a covered establishment'].) But the Legislature did not do so, and we are bound to apply the express definition drafted by the Legislature to the facts of this case." (*Id.* at p. 1086.)

We agree with this reasoning as applied to the facts of this case. The "separation from the position" definition does not suggest a severance from the employment relationship must occur before the notice duty triggers. Instead it encompasses a temporary job loss, even if some form of the employment relationship continues and the employees are given a return date.

This conclusion is consistent with section 1400's other statutory definitions. In defining the terms, the Legislature knew how to impose restrictions when it wanted to do so. For example, nearly all of the other definitions contain explicit time restrictions. A "[c]overed establishment" is an "industrial or commercial facility . . . that . . . has employed within the preceding 12 months, 75 or more persons." (§ 1400, subd. (a).) A "Mass layoff" is "a layoff during any 30-day period of 50 or more employees." (§ 1400, subd. (d).) And an "[e]mployee" is "a person employed by an employer for at least 6 months of the 12 months preceding the date on which notice is required." (§ 1400, subd. (h).) The fact that the Legislature included time limitations in many of section 1400's definitions, but chose *not* to include any similar limitations in specifying the length of a

13

"layoff" is evidence that the Legislature intended for the statute to apply to the type of "separation from position" that occurred in this case.

Our plain-meaning interpretation is consistent with the views of legal commentators who have recognized that a "mass layoff" is not limited to a permanent termination under the California WARN Act. In two respected treatises, the authors observed the statutory notification duty can arise even if the intended layoff will be temporary. (See Chin et al., Cal Practice Guide: Employment Litigation (The Rutter Group 2016) ¶ 6:792, p. 6-97 ["The California [WARN Act] does not state how long the employees must be off the job to constitute a 'layoff.' [¶] . . . Presumably, therefore, notice may be required even where the employer plans to and does *rehire* the affected employees within a few weeks or months."]; Kline & Olson, Cal. Bus. Law Deskbook (2016) § 20:4 [same].) Although the opinions of these commentators are not binding, they confirm our conclusion that when viewing the plain meaning of the statutory language, there does not appear to be any permanency requirement contained in the California WARN Act's "layoff" or "mass layoff" terms. (§ 1400, subds. (c), (d).)

NASSCO asserts various points in support of its argument that the plain meaning of the California WARN Act did not apply to its temporary layoffs (which it characterizes as "furloughs").

First, NASSCO contends statutory notice is required only if the employee " 'lost his or her employment,' " quoting from section 1402, subdivision (a). We agree that a "lost . . . employment" requirement, viewed in isolation, might suggest a stricter standard, but disagree that this phrase triggers liability under the California WARN Act. Section

14

1402 governs the *consequences* of "fail[ing] to give" the required notice and specifically refers to the statutory notice as that "required by paragraph (1) of subdivision (a) of Section 1401," which includes the definitions contained in section 1400. (§ 1402, subd. (a).) Reasonably read, section 1402 does not reflect the Legislature's intent to use the code section governing damages to alter the meaning of the "mass layoff" and "layoff" triggers already defined in the statute. Moreover, as will be discussed below, the federal WARN Act (on which the California WARN Act was patterned), defines "employment loss" to include a *temporary* loss of employment (a layoff for more than six months). (29 U.S.C. § 2101(a)(6).)

NASSCO alternatively relies on dictionary definitions and judicial decisions to support its view that a "separation" under section 1400, subdivision (c) means a complete termination of the employment relationship. Although a statutory term should be construed consistent with its " 'well-established *legal* meaning' " (*Brown v. Superior Court* (2016) 63 Cal.4th 335, 351), these authorities do not support that a "separation" has the fixed legal meaning attributed to it by NASSCO.

NASSCO cites Black's Law Dictionary, which defines "separation" to mean: "1. An arrangement whereby a husband and wife live apart from each other while remaining married . . . . 2. The status of a husband and wife having begun such an arrangement . . . . 3. Cessation of a contractual relationship, esp. in an employment situation." (Black's Law Dict. (10th ed. 2014) p. 1572, col. 1.) The first two definitions do not support that a "separation" means a termination of a legal relationship, and instead suggest the contrary: that a separation can occur while the parties remain in a legal relationship (married). The

15

third definition does imply a more permanent employment action by referring to a "cessation *of a contractual relationship.*" (*Ibid.,* italics added.) But in enacting the California Warn Act the Legislature did not identify the triggering event as a "cessation of a contractual relationship" or even "separation of a contractual relationship"; it said "separation from a position." By using this latter phrase, the Legislature expressed an intent that is broader than Black's Law Dictionary's third definition. When applying dictionary definitions, we do not consider the statutory words in isolation; we must read the language as it is placed in the code section, and in the context of the entire statutory scheme. (See *American Civil Liberties Union Foundation v. Superior Court* (2017) 3 Cal.5th 1032, 1039-1040 [Black's Law Dictionary's definitions of statutory phrase "are not specific" to statutory context and thus "afford us only minimal guidance about the meaning of the statutory text"]; *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1296 ["dictionary definitions [do not] shed light on the narrow [statutory interpretation] question at issue here"].)

We similarly find unhelpful NASSCO's reliance on two judicial decisions discussing an employee's "separation" in the context of public employee disability retirement laws. (See *Gonzalez v. Department of Corrections and Rehabilitation* (2011) 195 Cal.App.4th 89 (*Gonzalez*); *Mooney v. County of Orange* (2013) 212 Cal.App.4th 865 (*Mooney*).)

*Gonzalez* interpreted and harmonized Government Code sections 21153 and 19253.5 pertaining to public employee disability retirements. (*Gonzalez, supra,* 195 Cal.App.4th at p. 91.) In so doing, the court examined the purpose and legislative history

16

of these statutes and concluded "a state agency's duty to apply for disability retirement on behalf of a civil service employee arises only when the agency determines that the employee is medically unable to perform his or her usual job functions or the functions of any other available position within the agency and the employee is eligible for disability retirement and chooses not to waive the right to disability retirement." (*Id.* at p. 96, fns. omitted.) The court also noted that Government Code section 21153 "prohibits only 'separation' of a disabled employee, i.e., termination; it does not prohibit demotion or transfer." (*Gonzalez,* at p. 96.)

In *Mooney,* a county juvenile correction officer was unable to perform her duties as an officer, but could be accommodated in an office position. (*Mooney, supra,* 212 Cal.App.4th at pp. 868-870.) The plaintiff rejected this accommodation, and sued the county for disability discrimination and violation of several statutes, including Government Code section 31721, subdivision (a), which provides a county "may not separate because of disability a member otherwise eligible to retire for disability but shall apply for disability retirement of any eligible member believed to be disabled . . . ." In response to the county's argument that she was never "separated" from her employment because she still worked for the county, the employee relied on a related statute that used the word " 'dismissed' " as the triggering event for the county's duty, and argued that because the Legislature used two different words in two different statutes, it must have intended a different meaning. (*Mooney*, at p. 879.) The court rejected this argument, noting that although the terms " 'separate' and 'dismissed' " when used generally in employment law are not necessarily interchangeable because dismissed refers to a

17

termination at the employer's election whereas separate does not suggest which party initiated the *ending of the relationship*, when reading the terms "*in the context of the*[*se*] *particular statute*[*s*]," the Legislature "intended the term 'dismissed' in [Government Code] section 31725 and 'separate' in [Government Code] section 31721, subdivision (a) to mean the same thing." (*Id.* at pp. 879-880, italics added.)

Although *Gonzalez* and *Mooney* support that a separation from employment in the retirement disability context means a permanent end to the employment relationship, the courts' conclusions were tethered to the particular statutory schemes at issue and do not reflect a settled understanding of the "separation" term in other areas of employment law. (See, e.g., Gov. Code, § 19996 ["[a]ny such employee may be temporarily separated from the state civil service through layoff [or] permanently separated through resignation or removal for cause"]; Gov. Code, § 19998.3 [referring to a "layoff" as a "temporary separation"]; Gov. Code, § 19143 [referring to "temporary separation"]; Unemployment Ins. Code, § 13028.5 [same].) Moreover, we are required to construe "separation" in the context of the language in the same statute, particularly the phrase "separation from a position" (§ 1400, subd. (c)), which does not appear in NASSCO's cited authorities.

NASSCO's lengthy discussion of the differences between a "layoff" and a "furlough" is also unhelpful. No portion of the California WARN Act uses the term "furlough," nor do any of the judicial decisions interpreting the California WARN Act. Our focus must be on the statutory language, and not on the terms later used by the parties in characterizing their actions. In this regard, NASSCO's reliance on *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989 is

18

misplaced. In *Professional Engineers*, Governor Schwarzenegger issued an executive order implementing a mandatory two-day-per-month "furlough" of state employees. (*Id.* at p. 999.) In the portion of the opinion discussed by NASSCO, the high court examined whether the Governor had the authority to impose the furlough under Government Code section 19997, which authorizes a state employer to " '*lay off*' " state employees for " 'lack of . . . funds.' " (*Professional Engineers*, at pp. 1033-1036.) The court concluded that although a "furlough" could be superficially viewed as a less drastic version of a layoff, the two actions were functionally dissimilar under Government Code section 19997 because this statute provides specific procedures for laying off less senior employees that do not apply to an across-the-board employee furlough. (*Professional Engineers*, at pp. 1034-1036.) *Professional Engineers* stands for the proposition that a furlough and a layoff may be treated differently for purposes of evaluating the executive branch's authority to reduce public employee wages without legislative approval. This conclusion does not logically support NASSCO's contention that its own action did not constitute a "layoff" under the California WARN Act because it now labels its action a "furlough."

In its opening brief, NASSCO argues the California WARN Act applies only when there is a "severance" or "termination" of the "relationship between employer and employee." In its reply brief NASSCO proposes a different construction, acknowledging that a temporary "seven-month . . . absence from work" could trigger a statutory notification duty. NASSCO explains its view that "the California WARN Act embodies the presumption that a prolonged absence *is* a 'separation' severing the employment

19

relationship," and thus asserts that the California WARN Act applies only when directing employees to take more than "minimal time off of work."

There is no statutory support for this construction. The California WARN Act does not state a separation must occur for a specified time period, and there are no statutory grounds for determining the scope of such a proposed rule. Although an employer may view a five-week break as minimal, a worker who is living paycheck-to-paycheck may not. As discussed below, the California Legislature did not include the federal WARN Act's rule that the notification duty is triggered only when the layoff is for more than six months. Given this omission, there is no reasonable basis to interpret the statute to mean a four- or five-week layoff does not constitute a "separation from position," but a six- or seven-month layoff does.

### B. *Other Statutory Construction Tools*

Even assuming the relevant language of the California WARN Act is ambiguous, the legislative history and underlying public policy support the conclusion that an employer has the obligation to provide notice even if the intended layoff is temporary.

In 1988, Congress enacted the federal WARN Act to require 60 days' notice before any "plant closing or mass layoff." (29 U.S.C. § 2102(a).) About 15 years later, in 2003, the California Legislature enacted its own version (the California WARN Act), believing the federal law was ineffective in various respects and seeking to " 'supplement' " the law to provide stronger worker protections. (*MacIsaac, supra,* 134 Cal.App.4th at p. 1090.) In expanding the protections, the Legislature was concerned primarily that the federal WARN Act had limited application, requiring advance notice only when a large

20

employer (with more than 100 employees) implements a large employee layoff (33 percent of the workforce or 500 employees). (*MacIsaac,* at p. 1090; see Assem. Com. on Judiciary, Analysis of Assem. Bill No. 2957 (2001-2002 Reg. Sess.) April 16, 2002, p. 2; Assem. Com. on Appropriations, Analysis of Assem. Bill No. 2957 (2001-2002 Reg. Sess.) April 24, 2002, p. 2.) The California Legislature found these thresholds failed to alleviate the "devastating" consequences of unannounced worker layoffs in many communities. (Sen. Com. on Industrial Relations, Analysis of Assem. Bill No. 2957 (2001-2002 Reg. Sess.) June 26, 2002, p. 2.) The Legislature thus enacted new minimums: the California WARN Act requires notices for layoffs of 50 workers (regardless of the percentage of the workforce), and applies to employers that employ 75 or more persons. (§ 1400, subds. (a), (d); see *MacIsaac,* at p. 1090.)

The Legislature also changed other aspects of the federal law to strengthen worker protections. For example, under the California WARN Act, attorney fees are awarded only to prevailing plaintiffs (not to prevailing defendants as under federal law) (§ 1404; 29 U.S.C. § 2104(a)(6)); part-time employees are not excluded for purposes of calculating whether a mass layoff occurred (federal law expressly excludes these employees) (§ 1400, subd. (h); 29 U.S.C. § 2101(a)(1), (3)); the notice must be given directly to employees (and not just to employee representatives as under federal law) and to a broader scope of local officials and agencies (§ 1401, subd. (a)(2); 29 U.S.C. § 2102(a)(1)); and the California WARN Act's exception for "physical calamity or act of war" is more limited than the federal WARN Act exception for "business circumstances

that were not reasonably foreseeable as of the time that notice would have been required" (§ 1401, subd. (c); 29 U.S.C. § 2102(b)(2)(A)).

And of particular relevance here, in addition to lowering the threshold numbers for triggering the required notice, the Legislature changed the language used in the federal WARN Act's definition of a "mass layoff." The federal WARN Act requires 60 days' notice for a "plant closing" and "mass layoff" (29 U.S.C. § 2102(a)), and describes a "mass layoff" as: "a reduction in force which -- [¶] (A) is not the result of a plant closing; and [¶] (B) results in an *employment loss* [of the requisite number of employees]" (29 U.S.C. § 2101(a)(3), italics added). The federal WARN Act law then defines " 'employment loss' " to mean one of three things: "(A) an *employment termination*, other than a discharge for cause, voluntary departure, or retirement, (B) *a layoff exceeding 6 months*, or (C) *a reduction in hours of work* of more than 50 percent during each month of any 6-month period." (29 U.S.C. § 2101(a)(6), italics added.)

Under these statutory definitions, Congress did not limit a "mass layoff" to an employment termination. To the contrary, under the (B) and (C) subdivisions, a layoff occurs if the employment relationship continues, but the employer directs the employees not to return to work for a period "exceeding six months" or the employees remain in their positions but their hours are reduced (by the specified numbers). (29 U.S.C. § 2101(a)(6)(B), (C).) As noted by the Department of Labor, the statutory terms "termination" and "layoff" are distinguishable "and . . . have their common sense meanings. Thus, for the purposes of defining 'employment loss,' the term 'termination' means the permanent cessation of the employment relationship and the term 'layoff'

22

means the temporary cessation of that relationship."  (54 Fed. Reg. 16042(4)(f); see 20 C.F.R. § 639.3.)

The California Legislature used different language and a different statutory framework to define the "mass layoff" trigger.  Although the parties have not cited, nor have we found, any specific explanation in the legislative history materials for this change, we can draw some reasonable inferences from the redefinition.

First, we presume the California Legislature did not intend to adopt the exact same definition of a "mass layoff."  By using different words, it is reasonable to conclude the Legislature intended some change from the federal law.

Second, we can infer the Legislature necessarily understood that the term "layoff" under the federal law did not require an employment termination and instead encompassed temporary layoffs and certain specified reduction in hours.  (29 U.S.C. § 2101(a)(6).)  Therefore, we find unconvincing NASSCO's insistence that a layoff is normally (or in modern times) defined to mean only a complete termination of employment and thus the California Legislature must have intended to use this definition. We are required to consider statutory terms in context of related statutes, which the federal WARN Act certainly is.  (See *Pennington, supra,* 3 Cal.5th at p. 795; *Dieckmann v. Superior Court* (1985) 175 Cal.App.3d 345, 356.)  Thus we must presume that in enacting the California WARN Act the legislators understood the term layoff (in the framework of a "mass layoff" notice requirement) can encompass a temporary work stoppage.

Third, the entire thrust of the legislative effort in enacting the California WARN Act was to provide greater protection to California workers than was afforded under the federal law. Otherwise there would have been no need for a state law. When the statute was enacted, both temporary and permanent unannounced layoffs were causing economic problems in California. (Cal. Labor and Workforce Development Agency, Enrolled Bill Rep. on Assem. Bill No. 2957 (2001-2002 Reg. Sess.) Sept. 13, 2002, at pp. 5-6.)[4] The federal law expressly required notice before a temporary layoff (of six months or more) could be effectuated. (29 U.S.C. § 2101(a)(6).) It would be contrary to the fundamental legislative purpose seeking to better protect California workers to conclude the Legislature intended to completely eliminate the temporary-layoff notice requirement. Mindful of the federal WARN Act, if the Legislature wished to include only permanent layoffs, the Legislature could have defined the term "layoff" as a "permanent separation from a position." Or if it wished to maintain the six-month minimum, it could have defined "layoff" as a "separation from a position for six months." The Legislature did not include either of these limitations. Instead, the Legislature used the broader "separation from a position" phrase. (§ 1400, subd. (c).) Under a reasonable interpretation, this

---

[4] Although an enrolled bill report is generally prepared after the bill's enactment, courts may properly consider the information in these reports to understand the context of the legislation. (*People v. Bechtol* (2017) 10 Cal.App.5th 950, 959, fn. 11.) An enrolled bill report may be " 'instructive' in filling out the picture of the Legislature's purpose." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3.) The cited enrolled bill report was prepared by the California Labor and Workforce Development Agency, which has responsibility for enforcing the California WARN Act.

language reflects the Legislature's decision to incorporate the first two prongs of the federal definition but without the six-month limitation.[5]

NASSCO and its amici contend that a temporary layoff does not promote the public policies underlying the California WARN Act because the "primary" purpose of the notice requirement was to assist workers who become unemployed. However, the legislative history documents reflect the Legislature had several objectives in enacting the law, including to: (1) provide " 'affected employees the greater ability to make plans and adjustments to their new situation as well as seek other employment and educational opportunities' "; (2) " 'allow for local resources to be utilized helping to ease the strain caused by a layoff or plant closure on the community' "; and (3) "place local governments and other concerned entities 'in a better position to retrain and offer placement services to those affected' " (*MacIsaac, supra,* 134 Cal.App.4th at p. 1090).

These objectives are implicated when a temporary layoff occurs. As occurred in this case, workers who temporarily lose their wages may be unable to pay their rent or mortgage, child support, alimony, car payments, utility bills and groceries. Two months' notice would assist workers to find alternate funding sources for these fixed obligations, and provide them with the opportunity to make plans and adjustments and explore educational and/or short-term employment opportunities. Additionally, the notice would serve the statutory objectives by allowing local government agencies the opportunity to "intervene and offer . . . services to the employees, as well as pursue alternatives with the

---

5    The third prong of the federal WARN Act definition—the circumstance when an employee retains his or her position with reduced hours—is not before us on this appeal.

25

employer whenever feasible."  (Cal. Labor and Workforce Development Agency, Enrolled Bill Rep. on Assem. Bill No. 2957 (2001-2002 Reg. Sess.) Sept. 13, 2002, at p. 7.)  Although workers subject to a temporary layoff may not need training for a new job, advance notice would provide the workers time to plan and prepare for their sudden wage loss.

NASSCO argues the trial court's interpretation would "do more harm than good" because it would "encourag[e] employers to provide near-constant 'rolling' WARN notices, crying wolf so often that a true cry of distress would ultimately be ignored."  However, these actions would be against the law.  As amici acknowledge, the "federal regulations . . . *preclude* employers from engaging in this kind of 'rolling notice' practice."  (See 20 C.F.R. § 639.8 ["A ticketed notice, i.e., preprinted notice regularly included in each employee's pay check or pay envelope, does not meet the requirements of WARN."]; *id.* § 639.10(b) ["Rolling notice . . . is not acceptable"].)

NASSCO alternatively urges us to write into the statute a six-month limitation for temporary layoffs, asserting this would be a more reasonable standard.  The argument is unavailing.  As an appellate court we have no power to rewrite a law.  (See *California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist*. (1997) 14 Cal.4th 627, 633.)  Additionally, it is not reasonable to conclude the California Legislature intended to adopt the federal law's six-month limitation.  If it had, it could and would have used the same language.  An "omission of a provision contained in a foreign statute providing the model for action by the Legislature is strong indication that the Legislature did *not* intend to import such provision into the state statute."  (*J. R. Norton Co. v. General Teamsters,*

26

*Warehousemen & Helpers Union, Local 890* (1989) 208 Cal.App.3d 430, 442, italics added; see *San Bernardino Valley Audubon Society v. City of Morena Valley* (1996) 44 Cal.App.4th 593, 604.)

NASSCO and its supporting amici strenuously argue an interpretation that the California WARN Act applies to temporary layoffs without a six-month limitation will lead to "absurd" results. "The language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend." (*Harris v. Appellate Division of Superior Court* (2017) 14 Cal.App.5th 142, 148; accord *Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.)

NASSCO contends that applying the California WARN Act to a temporary layoff will unreasonably require notices for " 'long holiday weekends,' " the " 'week between Christmas and New Year,' " and/or for unforeseen events. With respect to the latter, NASSCO asks: "What if an employer shuts down or delays opening for a few hours, because of a local event? . . . What if a key supervisor is sick or injured and workers are sent home a few hours early? What if a business closes down for a few hours or a full day due to lack of inventory?" In a similar vein, amici argue that requiring notice of temporary layoffs would be unworkable because no business can account for the "many 'unexpected circumstances' that cause work slow-downs and stoppages."

These arguments do not provide grounds for refusing to enforce the California WARN Act as it is written. First, we need not speculate about the scope of an employer's obligations under the hypothetical situations because these circumstances are not before this court. The issue here is whether NASSCO's layoff was covered by the California

27

WARN Act. The undisputed facts establish that although NASSCO was aware of the need for layoffs, they did not inform at least 90 workers until the day they reported to work that they would be laid off starting immediately. During the approximate four-to-five week layoff, the 90 employees performed no work, received no wages, earned no vacation time, and accrued no pension service credit. There is no showing NASSCO could not have reasonably provided the notice, or that a notice requirement would be absurd or unworkable under these circumstances.

Second, contrary to NASSCO's and amici's assertions, there is nothing in the legislative history documents showing the Legislature intended to exclude layoffs resulting from unforeseeable events. The California Legislature made a decision *not* to incorporate the federal law's unforeseeable-circumstances exception and narrowed the federal exception to a "physical calamity or act of war." (§ 1401, subd. (c); see Sen. Com. on Labor and Industrial Relations, Analysis of Assem. Bill No. 2957 (2001-2002 Reg. Sess.) as amended June 17, 2002, p. 3 [in "Background Responses," deleting "other unforeseeable circumstances" from proposed bill].) Thus, assuming a brief unforeseeable layoff was the result of "lack of funds or lack of work" (§ 1400, subd. (c)) and the layoff would not come within the de minimus doctrine or a statutory exception, the employer will need to pay the employees their wages. If the employer compensates the employees within three weeks, the employer will not be subject to any penalties. (§ 1403.)

These provisions reflect a deliberate decision to shift the burden of unexpected, unplanned—even brief—work stoppages for "lack of funds or lack of work" to the employer rather than to the employees (§ 1400, subd. (c)), and represents the

28

Legislature's judgment that California employers, not California employees, should bear the risk of surprise resulting from an unexpected layoff.  Whether this judgment is a wise legislative decision is not before us.  The process of weighing the relative benefits of advance notice to California workers against the costs to California employers is an inherently legislative function.  The Court of Appeal is not the proper forum for rewriting the California WARN Act to minimize the perceived burdens imposed on California's businesses.  To the extent NASSCO or its supporting amici have complaints regarding the high cost of complying with the California WARN Act in its current form, they should direct those concerns to the California Legislature, which is better suited as a policy-making body to consider and respond to those concerns.

Finally, to the extent there is any remaining ambiguity, we are required to favor the employees' interpretation.  The California WARN Act is a remedial statute designed to provide protections to workers, their families, and communities.  (See *Day v. Celadon Trucking Servs., Inc.* (2016) 827 F.3d 817, 835; *Cashman v. Dolce International/Hartford* (D. Conn. 2004) 225 F.R.D. 73, 80-81.)  As the Ninth Circuit has explained in interpreting the federal WARN Act, the WARN Act " 'is a wage workers' equivalent of business interruption insurance.  It protects a worker from being told on payday that . . . his [or her] stream of income [will be] shut off [temporarily or permanently], though he has to buy groceries for his family that weekend and make a mortgage payment the next week.' "  (*Collins v. Gee W. Seattle LLC* (9th Cir. 2011) 631 F.3d 1001, 1007; *Burns v. Stone Forest Indus.* (9th Cir. 1998) 147 F.3d 1182, 1184.)  In construing remedial statutes of this type, " 'the statutory provisions are to be liberally

construed with an eye to promoting such protection.' " (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1026-1027; accord *Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 532; *Continental Cas. Co. v. Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 434.)

Because the statutory language and purpose of the California WARN Act support its application to the temporary layoff at issue here, the court properly granted plaintiffs' summary adjudication motion.

## DISPOSITION

Judgment affirmed.  Appellants to bear respondents' costs on appeal.

HALLER, J.

WE CONCUR:

NARES, Acting P. J.

DATO, J.